Argued and submitted March 25, reversed and remanded with instructions
November 20, 1985

In the Matter of the Compensation of
Howard H. Hurst, Claimant.

**HURST,**
*Petitioner,*

*v.*

**STATE ACCIDENT INSURANCE FUND
CORPORATION,**
*Respondent.*

(83-01616; CA A32726)

709 P2d 1149

Alan M. Scott, Portland, argued the cause for petitioner. With him on the brief were Jill Backes and Galton, Popick & Scott, Portland.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

NEWMAN, J.

## NEWMAN, J.

Claimant petitions for review of an order of the Workers' Compensation Board that found his heart attack not compensable. He was a 49-year-old business agent for a Teamster's Union local. He organized union representation at new companies, negotiated contracts, handled grievances and policed his jurisdiction for contract violations. For six months before his heart attack, he had worked long hours under serious stress. He faced a disgruntled union constituency, an impending union election, major contract negotiations, employer contract violations and a "running battle" with the president of the local union. He had frequently lost sleep at night during that time because of his worry over his job.

On October 4, 1982, claimant arose between 4:30 a.m. and 5 a.m. to travel about 75 miles from Portland to Parkdale. He left Portland at 6 a.m., stopped to pick up another union business agent in Hood River and arrived in Parkdale around 8 a.m. He went to a job site that employed non-union drivers and had a bitter confrontation with a former union member that lasted until about 11 a.m. The meeting almost turned into a fistfight. Claimant had concern for his own safety and was very tense. He felt "drained" when he left Parkdale.

After lunch on the trip back to Portland, claimant "had a lot of—it felt like indigestion or heartburn * * *." He arrived in Portland around 3 p.m. and met with a group of shop stewards at 4 p.m. to discuss an employer's contract offer. He got into "a hell of an argument" with one steward and "exploded." He again felt drained and thought he had heartburn as he left the meeting. Without eating, claimant went to his evening bowling league. He did not feel well, bowled poorly and became irate.

Claimant went home around 9 p.m. He did not feel well and felt "stuffed up here." He ate, stayed up for a while and then went to bed. He awoke at 4 or 4:30 a.m. on October 5 and felt "like there was a steam roller rolling over my chest." His wife drove him to the hospital. He was suffering an acute myocardial infarction.

We analyze claimant's heart attack as an accidental injury. *Adams v. Gilbert Tow Service,* 69 Or App 318, 684 P2d 1254 (1984); *Bush v. SAIF,* 68 Or App 230, 680 P2d 1010

(1984); *Harris v. Farmers' Co-op Creamery,* 53 Or App 618, 632 P2d 1299, *rev den* 291 Or 893 (1981). Claimant established legal causation—that he suffered stress on his job. He must also prove medical causation by a preponderance of the evidence—that the stress of his job was, "within the range of reasonable medical probability, a material contributing cause of his myocardial infarction." *Adams v. Gilbert Tow Service, supra,* 69 Or App at 321. The opinions of four doctors are pertinent.

Dr. Hamilton, a cardiologist, treated claimant on his admission to the hospital on October 5, 1982, and performed a coronary angiography on October 19, 1982. The angiogram confirmed that claimant also suffered from arteriosclerotic heart disease that pre-existed the infarction. SAIF wrote the following request to Hamilton:

> "May we have your opinion as to the relationship of Mr. Hurst's recent heart attack to his work activities with General Teamster Local 162. It appears that Mr. Hurst has had a long standing problem and treatment for his heart. Do you believe that Mr. Hurst's work activities with General Teamster 162 was the primary contributing factor in his recent heart attack or do you think it was more due to the natural progression of disease process?"

He responded:

> "In answer to the above question. No, I do not feel that Mr. Hurst's work activities were *the* contributing factor in his recent heart attack." (Emphasis supplied.)

The issue here, however, is not whether claimant's work stress was "the primary contributing factor," but whether claimant's work was a material contributing cause of his infarction. Hamilton's response does not state that claimant's work was not a *material* cause of the attack. Moreover, Hamilton's admission history does not indicate that he was aware of claimant's work on or before October 4.

Dr. Kremkau reviewed claimant's files for SAIF, which asked:

> "Considering the past history of this patient, the risk factors involved, the nature of the incident reported and the diagnosis established we ask that you answer the following question. In your opinion were the work activities described a material contributing cause of the condition that has been diagnosed or

was this condition the result of the natural progress of disease?"

Kremkau responded:

"In my opinion Mr. Hurst's myocardial infarction likely occurred as the result of natural progression of his atherosclerotic vascular disease which was related to the multiple risk factors listed. I do not think his work activites were a material contributing factor of the atherosclerosis nor of the occurrence of the myocardial infarction."

She identifed a clot as the probable trigger of claimant's attack. She had reported:

"The myocardial infarction occurred with blockage of blood flow in the right coronary artery. The blockage probably occurred as a result of blood clot formation at a site that had been narrowed by atherosclerotic plaque. The exact cause of formation of the blood clot is unknown."

It is not clear from the record whether Kremkau was fully advised of the nature of claimant's work on or before October 4.

Dr. Girod, a witness for employer, graduated from medical school in 1976 and was board certified in internal medicine in 1979. His practice is internal medicine. Several months of his residency were devoted to cardiology. Since 1982, he has treated a number of cardiac patients. He testified on the basis of claimant's medical records and the testimony at the hearing. He testified that psychological stress can be a triggering or precipitating factor in a heart attack. He further stated that, when that is the case, the stress is ordinarily accompanied by severe, persistent chest pain over a long period of time and that the attack would likely occur then and not later. Given claimant's description of his day on October 4, Girod testified that in his opinion the role of stress in the attack was "debatable" and that he could not form an opinion within a reasonable degree of medical certainty as to what role stress played. He also testified:

"Q. Can you come to an opinion within a reasonable degree of medical probability what would be *the* major contributing cause of his heart attack on that day?

"A. The atherosclerotic disease in his right coronary artery * * *. That's the process, the process of atherosclerosis,

that was certainly *the* main factor that caused the heart attack." (Emphasis supplied.)

His answer does not address the question whether the job stress was a material contributing cause of claimant's heart attack.

Dr. Griswold submitted a report that was based on claimant's medical records and a meeting with claimant. He also testified at the hearing. Griswold's career includes 35 years as a professor of medicine at the University of Oregon Health Sciences Center, work at the National Heart Institute in London, a fellowship at Johns Hopkins Hospital and board certification in internal medicine. Griswold unequivocally asserted that claimant's job stress was a material contributing cause of the heart attack.

Griswold related claimant's experiences of October 4 and concluded that he was under considerable stress at work, that his chest sensations were "persistent, not simply angina" and that those pains were "symptoms of acute coronary insufficiency or pre-infarction syndrome precipitated by his work activities." He then described how the stress could precipitate an attack:

"Well, one of several things or a combination of them was probably occurring. One, with this meeting, which he says it was a rather heated meeting; during such a period, blood pressure can become elevated, heart rate goes up, adrenalin is being liberated by the adrenal medulla, the portion of the adrenal gland which produces adrenalin. All this can increase the heart rate, blood pressure, workload on the heart.

"In addition, in this environment we know the blood lipids can change; platelet stickiness can increase; development of a small clot, which can propagate later on, can begin to occur under such stress; as well as the matter of having coronary spasm which we know does occur in people — may occur in people under this type of environmental situation. All this could lead to the final culmination of a frank heart attack and death of heart muscle tissue."

Griswold testified that claimant's attack followed a common pattern:

"[A] specific episode of emotional stress at noon, later on in the afternoon, with symptoms, with a feeling or unwellness

continuing, and finally a heart attack for him the next morning. This is a common story in my experience."

He further stated:

"More important is the work activity on the 4th of * * * October of last year, 1982, was the immediate precipitating episode which resulted in his heart attack."

On cross-examination, Griswold testified:

"Q. Isn't that what your opinion is as to a job stress, as to what impact that had on his heart attack?

"A. I think that's the most significant, important fact in Mr. Hurst's case.

"Q. But, you're just speculating as to what impact that has, aren't you, Doctor?

"A. I think it's significant.

"Q. How significant?

"A. Major contributing factor — 80 percent, 90 percent, 75 percent."

Hamilton and Kremkau noted that claimant's family history, smoking, mildly increased blood pressure and elevated cholesterol were "risk factors" in the development of arteriosclerotic heart disease. Kremkau also mentioned claimant's obesity. Neither doctor stated whether these factors also increased the risk of a heart attack. Girod noted the potentialities of the same risk factors, as well as that claimant was male, in development of the disease and in the increased risk of heart attack. He testified that claimant's cholesterol level and smoking were very important risk factors but that claimant's weight and blood pressure were not risk factors. Griswold acknowledged the relationship of the risk factors to development of heart disease and incidence of heart attacks. He did not discuss their particular application to claimant, except that he believed that claimant's weight was not great enough to be a risk factor. He testified:

"I think that these risk factors would establish the milieu of an individual who would be more coronary prone. But I think that they were not the immediate precipitating cause of this heart attack. In other words, I think the—to me, the specific work history that Mr. Hurst detailed to me in person—I spent a considerable amount of time with him— was the thing which you might say broke the camel's back."

Although claimant suffered an infarction after he had left work, he was under severe stress while at work. As a result of that stress, according to Griswold's testimony, claimant showed symptoms at work of the approaching infarction. The attack he suffered during the night following that stress and those symptoms was, in Griswold's view, a "common story." We find Griswold's testimony persuasive. Accordingly, we hold that claimant proved by a preponderance of the evidence that his job stress was a material contributing cause of his myocardial infarction. Claimant's injury is compensable.

Reversed and remanded with instructions to accept the claim.